Mariana H. Garcia, Plaintiff *pro se*
Post Office Box 1335
Rawlins, WY 82301-1335
Voice (307) 321-0233
E-mail: cpmg@bresnan.net
**FOR THE PLAINTIFF**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

NOV 1 7 2010

Stephan Harris, Clerk
Cheyenne

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **MARIANA H. GARCIA,** | ) |
| | ) |
| | ) **DOCKET NO.** _2:2010-CV- 253 - ᐳ |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| **INQB8, LLC.,** a foreign limited liability | ) |
| company d/b/a Discount Mortgage Relief and | ) |
| Mortgage Relief; **MORTGAGE RELIEF,** | ) |
| **LLC.,** an Arizona limited liability company, d/b/a | ) |
| Mortgage Relief; **JOHN COMMON AND** | ) |
| **JANE DOE COMMON,** husband and wife; | ) |
| **BRUCE SPURLOCK and JANE DOE** | ) |
| **SPURLOCK,** husband and wife, and **JOHN AND** | ) |
| **JANE DOES 1 THROUGH 10,** | ) |
| | ) |
| Defendants. | ) |

## CIVIL COMPLAINT

For her Complaint, Plaintiff, Mariana H. Garcia, alleges as follows:

## **INTRODUCTION**

Defendants INQB8, LLC and Mortgage Relief, LLC have and continue to do business in Arizona as a mortgage loan modification business under various names, including Discount Mortgage Relief and, most recently, Mortgage Relief. This company has also conducted business in Wyoming with at least one client, the Plaintiff.

Defendants John Common and Bruce Spurlock are the principal owners, operators and managers of Discount Mortgage Relief and Mortgage Relief ("DMR/MR").

The Plaintiff alleges that Defendants violated the Federal Consumer Fraud Act by, among other things: misleading potential clients into believing that they were guaranteed loan modifications; falsely promising potential clients specific results; falsely representing that DMR/MR's services involved attorneys negotiating loan modifications; falsely representing that DMR/MR was associated with the government or with a consumer's lender; misrepresenting DMR/MR's success rate; falsely stating that DMR/MR is "FBI Certified"; falsely telling consumers that foreclosure proceedings would automatically stop once they contracted with DMR/MR; misrepresenting that DMR/MR would refund client's fees if it could not obtain a loan modification for them; and failing to return fees to consumers who decide not to hire the company, while continuing to charge their financial accounts for additional amounts.

The Plaintiff is requesting appropriate injunctive and other relief against the Defendants for their violations of the Federal Consumer Fraud Act, including a refund of all monies paid, plus interest, court costs and legal fees.

## JURISDICTION AND VENUE

1. This action is brought pursuant to the Federal Consumer Fraud Act to obtain injunctive relief to prevent the unlawful acts and practices alleged in this Complaint and other relief, including financial reimbursement, civil penalties, costs of investigation and Court costs.

2. This Court has jurisdiction to enter appropriate orders both prior to and following a determination of liability pursuant to the Federal Consumer Fraud Act.

3. The amount in controversy exceeds the jurisdictional minimum of this Court and venue in the United States District Court for the District of Wyoming is proper because the acts or omissions that form the basis for Plaintiff's claims occurred entirely within this district.

4. Plaintiff, Mariana H. Garcia is, and was so at all times relevant to this Complaint a resident of Carbon County, Wyoming.

5. Defendant INQB8, LLC is a Delaware limited liability company that operates a mortgage loan modification business in Scottsdale, Arizona under the names Discount Mortgage Relief and Mortgage Relief.

6. Defendant Mortgage Relief, LLC is an Arizona limited liability company whose sole member and manager is INQB8, LLC and who operates a mortgage loan modification business in Scottsdale, Arizona under the name Mortgage Relief.

7. Defendant John Common is an owner and manager of Discount Mortgage Relief and Mortgage Relief. Defendant Common's actions allege herein were taken in furtherance of his and Defendant Jane Doe Common's marital community. As an owner and manager of Discount Mortgage Relief and Mortgage Relief, Defendant Common, with actual and/or constructive knowledge, approved, endorsed, directed, ratified, controlled or otherwise participated in the illegal acts and practices alleged herein.

8. Defendant Bruce Spurlock is an owner and manager of Discount Mortgage Relief and Mortgage Relief. Defendant Spurlock's actions alleged herein were taken in furtherance of his and Defendant Jane Doe Spurlock's marital community. As an owner and manager of Discount Mortgage Relief and Mortgage Relief, Defendant Spurlock, with actual and/or constructive

knowledge, approved, endorsed, directed, ratified, controlled or otherwise participated in the illegal acts and practices alleged herein.

## FACTUAL BACKGROUND

9. From at least July 2009 to the present, Defendant INQB8, Inc. operated a mortgage loan modification business in Scottsdale, Arizona under the names Discount Mortgage Relief and Mortgage Relief, among others.

10. Mortgage Relief, LLC was formed on January 15, 2010 with Defendant INQB8, Inc. as the sole member and manager thereof and operates a mortgage loan modification business in Scottsdale, Arizona under the name Mortgage Relief.

11. DMR/MR advertises its mortgage loan modification services to consumers throughout the United States with television advertisements that include telephone numbers consumers can call to contact DMR/MR about its services.

12. DMR/MR also advertises its mortgage loan modification services on the internet at www.discountmortagerelief.com.

13. DMR/MR has contracted with thousands of consumers for its loan modification services.

14. Consumers who contract DMR/MR to inquire about the company's mortgage loan modification services initially talk to a DMR/MR salesperson who, if the consumer agrees to purchase DMR/MR's services, takes the consumer's credit or debit card information over the telephone and initiates a partial or full payment for DMR/MR's services, the cost of which ranges from approximately $1,350.00 to approximately $5,000.00.

15. At various times from at least July 2009 to the present, DMR/MR's salespersons told consumers during their initial telephone call to the company, and before they agreed to purchase DMR/MR's services, that the consumer was "pre-qualified" and was guaranteed to obtain assistance.

16. At the time DMR/MR represented to potential clients that they were "pre-qualified" and guaranteed assistance, DMR/MR did not have any knowledge of whether any given potential client would obtain a loan modification.

17. Many of DMR/MR's clients who were told by the company that they were "pre-qualified" and guaranteed a loan modification did not obtain a loan modification through

DMR/MR's services and, in some cases, ended up losing their homes to foreclosure after hiring DMR/MR.

18. At various times from at least July 2009 to the present, DMR/MR's salespersons told consumers during their initial telephone call to the company, and before they agreed to purchase DMR/MR's services, that DMR/MR could obtain specific results for them, including but not limited to, reduced interest rates and principal and elimination of second mortgages, often quoting to the consumer a specific mortgage payment that was significantly lower than the consumer's then-current payment based on the represented results.

19. At the time its salesperson made representations to potential clients about specific results the company could obtain for them, DMR/MR had no knowledge of whether any given potential client's lender would offer a loan modification whatsoever, let alone on any specific terms.

20. Many of DMR/MR's clients, who were told by the company that it could get them specific results, such as reduced interest rates and principal and elimination of second mortgages, did not obtain the promised results.

21. At various times from at least July 2009 to the present, DMR/MR's salespersons told consumers during their initial telephone call to the company, and before they agreed to purchase DMR/MR's services, that if they paid DMR/MR for its services that any ongoing foreclosure proceedings involving their homes would automatically stop.

22. Merely contracting DMR/MR for its services had no automatic effect on foreclosure proceedings; moreover, at the time its salespersons told potential clients about the "automatic" effect on foreclosure proceedings, DMR/MR had no knowledge of whether it would be able to stop any such proceeding for any given potential client.

23. At various times from at least July 2009 to present, DMR/MR's salespersons told consumers during their initial telephone call to the company, and before they agreed to purchase DMR/MR's services, that if they stopped making their mortgage payments that their lender could not report such non-payments to any credit bureau.

24. Contrary to DMR/MR's statements to consumers that credit bureaus would not report missed payments, credit bureaus do report such payments and such reports can negatively affect consumers' credit scores.

25. At various times from at least July 2009 to the present, DMR/MR's salespersons told consumers during their initial telephone call to the company, and before they agreed to purchase DMR/MR's services, that the loan modification process would take from thirty to forty-five days to complete.

26. At the time DMR/MR made representations to potential clients of a thirty to forty-five day modification process, DMR/MR had no knowledge whether any given potential client would receive a modification or how long any successful modification process would take. Moreover, at the time DMR/MR made its representation regarding a time frame for modifications, it had hundreds of open files that were several months old.

27. At various times from at least July 2009 to the present, DMR/MR's salespersons told consumers during their initial telephone call to the company, and before the consumer agreed to purchase DMR/MR's services, that an attorney would negotiate the consumer's loan modification request with the consumer's bank.

28. DMR/MR did not use attorneys to negotiate its clients' loan modification requests.

29. At various times from at least July 2009 to the present, DMR/MR's salespersons told consumers during their initial telephone call to the company, and before they agreed to purchase DMR/MR's services, that DMR/MR had a 90% and 95% success rate, respectively.

30. At the time DMR/MR made representations to consumers regarding its success rates, the large majority of DMR/MR's clients had not received a loan modification.

31. At various times from at least July 2009 to the present, DMR/MR's salespersons told consumers during their initial telephone call to the company, and before they agreed to purchase DMR/MR's services, that if you were a veteran that you were guaranteed a mortgage loan modification.

32. Contrary to DMR/MR's representations that veterans were guaranteed to obtain a loan modification, no such guarantee exists and DMR/MR had no factual basis upon which to make such a representation.

33. At various times from at least July 2009 and to the present, DMR/MR's salespersons told consumers during their initial telephone call to the company, and before they agreed to purchase DMR/MR's services, that DMR/MR had a 100% success rate of obtaining mortgage modifications from Chase Bank.

34. At the time DMR/MR made its representations regarding its success rate with Chase Bank, it had not successfully modified every client's loan with Chase Bank.

35. At various times from at least July 2009 to the present, DMR/MR's salespersons represented to consumers during their initial telephone call to the company, and before the consumer agreed to purchase DMR/MR's services, that DMR/MR was associated with the consumer's lender.

36. DMR/MR was not associated with, nor did it represent or work on behalf of, its loan modification clients' lenders.

37. At various times from at least July 2009 to the present, DMR/MR's salespersons represented to consumers during their initial telephone call to the company, and before they agreed to purchase DMR?MR's services, that DMR/MR was affiliated with the government.

38. DMR/MR was not associated with, endorsed by, or in any way authorized to act on behalf of any government entity.

39. On April 01, 2010, the Federal Bureau of Investigation and the Arizona Attorney General's Office executed a search warrant at DMR/MR's offices.

40. At various times after April 01, 2010, DMR/MR's employees told some of its potential and active clients who contracted with the company with questions regarding the FBI's involvement that DMR/MR had been "FBI Certified."

41. Neither the Federal Bureau of Investigation nor any other law enforcement or government agency has ever "certified" or in any way approved of or endorsed DMR/MR's practices.

42. DMR/MR describes itself as "A Nationwide Pre-Paid Legal Services Company" on its website.

43. In its "Client Fee Contract," DMR/MR refers to itself as a "Pre-Paid Legal Services Company" and the fees paid to it by consumers for loan modification services as "Pre-Paid Legal Service Fees."

44. DMR/MR asks its clients to sign an "ACH and Credit Card Authorization" form that allows DMR/MR to debit or charge its clients' accounts as payment for its services. DMR/<R states on its Authorization form that the client's payment to the company is for "foreclosure and loan modification assistance and related legal services."

45. DMR/MR does not provide legal services to any of its clients, nor does any attorney negotiate loan modification requests on behalf of DMR/MR's clients.

46. DMR/MR states in its client contracts "[w]e will review and analyze loan documentation to ensure compliance with RESPA, TILA, HOEPA, and other lending practices" while further describing its services as as "forensic loan document audit."

47. DMR/MR does not conduct any legal or forensic analysis of audit of its clients' files and its loan modification services consist primarily of clerical work, forwarding clients' documents and loan requests to lenders and conducting follow-uptelephone calls withlenders and clients.

48. In its client agreements, DMR/MR promises its clients a full refund of any fees they pay to the company if it cannot obtain a loan modification that saves the cleints a multiple of 15 (fifteen) times the service fee," provided the client provides DMR/MR with all requested and necessary information.

49. DMR/MR consistently failed to refund fees to clients for who it was unable to obtain a loan modification and who complied with their obligations under their agreement with DMR/MR.

50. If a consumer agrees to purchase DMR/MR's services, the company immediately charges the consumer's credit or denit card for at least a partial payment of fees, while later sending the consumer a written contract for their signature. Some consumers who, after initaially agreeing to purchase DMR/MR's services but before signing the contract, decided against hiring the company, refused to sign the contract, and requested a refund of their fees, often within three days from the date they first contacted DMR/MR and before any substantive work was performed by DMR/MR.

51. DMR/MR failed to refund fees to consumers who, prior to any substantive work being performed by DMR/MR and without having singed a contract, informed the  conpany that they were not going to hire the company and requested a refund. Moreover, in some cases DMR/MR continued to charge or denit consumers' accounts after the consumers informed the company that they were not going to hire it or sign a contract.

52. From at least July 2009 to the present, Defendant John Common directed and ran the day-to-day operations of DMR/MR, including supervising and training the company's salespersons and writing the scripts they used when talking to potential clients.

53. From at least July 2009 to the present, Defendant Bruce Spurlock co-managed DMR/MR with John Common at the company's Scottsdale, Arizona location and was involved in the day-to-day operations of the company.

54. Both John Common and Bruce Spurlock were aware that DMR/MR engaged in the unlawful acts and practices described in this Complaint and failed to make any changes to the company's operations to remedy or prevent the acts and practices from continuing.

## CLAIM FOR RELIEF

## COUNT 1: CONSUMER FRAUD

55. Plaintiff re-alleges the allegations contained within paragraphs 1-54 above-herein, as though fully set forth below.

56. The Defendants engaged in the use of deception, deceptive acts or practices, fraud, false pretense, false promise, misrepresentation, or concealment suppression or omission, in connection with its advertisement, sale or delivery of services. Such acts and practices include:

      a.      Misrepresenting to consumers that they were pre-qualified and guaranteed a loan modification through DMR/MR's services;

      b.      Falsely promising consumers specific, favorable results;

c.      Falsely telling consumers that if they hired DMR/MR that any foreclosure proceedings against their homes would automatically stop;

d.      Misleading consumers into believing that once they hired DMR/MR that if they stopped making their mortgage payments that there would be no negative consequences to their credit;

e.      Misrepresenting to consumers the amount of time DMR/MR takes to complete a loan modification;

f.      Misrepresenting to consumers that DMR/MR's services involve legal services or the assistance of an attorney;

g.      Misrepresenting DMR/MR's rate of success in obtaining loan modifications for its clients;

h.      Misrepresenting to consumers that DMR/MR is associated with or acting on behalf of the government;

i.      Misrepresenting to consumers that DMR/MR is associated with or acting on behalf of the consumer's lender;

j.      Falsely telling consumers that DMR/MR is "FBI Certified";

k.      Misrepresenting the nature of DMR/MR's loan modification services by referring to them as forensic loan documentation audits or analyses;

l.      Misrepresenting to consumers that they will get a refund of fees if DMR/MR fails to get them a loan modification; and

      m.     Failing to return fees to consumers who decide not to hire the company and who cancel their initial agreement without ever having signed a contract.

57. At all times mentioned in this Complaint, Defendants acted intentionally and with total disregard.

## COUNT 2: THEFT OF FUNDS

58. Defendants did in fact take one thousand five hundred ($1,500.00) dollars from the Plaintiff. Such funds were taken on April 15, 2010 by Defendants from the Plaintiff's bank account.

59. Defendants failed to uphold their contract by preventing foreclosure on the Plaintiff's home. In fact, Defendants did not take any action at all with regard to the Plaintiff's mortgage issues, although the Defendants did make false promises to do so.

60. Plaintiff did send a written demand letter to the Defendants demanding a refund of the $1,500.00 fee that was deducted from the Plaintiff's bank account. Defendants failed to respond to the demand letter. The Defendants have also refused to return phone calls made by the Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

1.      Enter an injunction against Defendants prohibiting them from engaging in the unlawful acts and practices alleged in this Complaint and from doing any acts in furtherance of such acts and practices, pursuant to the Federal Consumer Fraud Act;

2.      Order Defendants to restore to all persons any money and property acquired by any unlawful means or practice alleged in the Complaint, as deemed appropriate by the Court.

3. For judgment in favor of the Plaintiff in the amount of $25,000.00 to compensate her for her personal injuries, and such other compensatory damages which the Court or a jury may properly award in accordance with the evidence at the trial of this matter;

4. For punitive damages against the Defendants in an amount sufficient to punish them for their malicious, willful and wanton conduct, to publicly condemn their actions and to serve as a warning and deterrent to others similarly situated, which such amount shall not be less than $10,000.00; and

4. For Plaintiff's costs in bringing this action, including but not limited to, her reasonable attorneys fees, process of service fees, filing fees and such other and further relief as the Court may deem appropriate under the circumstances.

**DATED** this _30_ day of October, 2010.

Mariana H. Garcia, Plaintiff *pro se*
Post Office Box 1335
Rawlins, WY 82301-1335
Voice (307) 321-0233
E-mail: cpmg@bresnan.net